**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CENTRAL JERSEY, CML, | |
| Plaintiff, | Civil Action No. 17-12706 (MAS) (DEA) |
| v. | |
| KAUSHIK PATEL, *et al.*, | **MEMORANDUM OPINION** |
| Defendants. | |

**SHIPP, District Judge**

This matter comes before the Court upon Defendants Kaushik Patel, Ashwin Chaudhary, Dipen Patel, Yogesh Patel, Vipul Patel, Gulu Puri, Nilesh Patel, Danny Saparia, the Estate of Suresh Patel, and Atul Patel's Motion for Summary Judgment (ECF No. 28), and Plaintiff Central Jersey, CML's ("Plaintiff" or the "Central CML") Amended Motion for Summary Judgment (ECF No. 40).[1] In response to Defendants' Motion, Plaintiff submitted a Statement of Material Facts in Opposition (ECF No. 32) and an Opposition Brief (ECF No. 33), to which Defendants replied (ECF No. 35.) Defendants opposed Plaintiff's Motion. (ECF No. 44.) Plaintiff did not reply to Defendants' opposition.[2] The Court has carefully considered the parties' submissions and decides

---

[1] The Court notes that Plaintiff's Motion was unaccompanied by a Notice of Motion, as required by Local Civil Rule 7.1(b)(2).

[2] Plaintiff submitted an informal Letter Brief in reply to Defendants' opposition to Plaintiff's original motion for summary judgment. (ECF No. 36.) Plaintiff, however, did not file a reply to Defendants' opposition to Plaintiff's Amended Motion for Summary Judgment. The Court also notes that Plaintiff's Letter Brief, apart from briefly referencing a case cited by Defendants, contains no citation to legal authority. (*Id.*)

this matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, Plaintiff's Amended Motion for Summary Judgment is denied and Defendants' Motion for Summary Judgment is granted.

## I.   BACKGROUND

### A.   Undisputed Facts

#### 1.   Background Information and the South CML

The South Jersey CML, LLC (the "South CML") is a limited liability company, organized under the laws of New Jersey, that manages and operates a baking facility that distributes inventory to Dunkin' Donuts stores throughout southern New Jersey.[3] (Plaintiff's Statement of Undisputed Material Facts ("PSUMF") ¶¶ 1–2, ECF No. 40-1; Defendants' Statement of Undisputed Material Facts ("DSUMF") ¶ 2, ECF No. 28–2.) Defendants are 10 of the 12 members of the South CML. (Plaintiff's Responsive Statement of Material Facts and Counter-Statement of Material Facts ("PRSUMF") ¶ 1, ECF No. 32; DSUMF ¶ 1.) The South CML delivers product to Dunkin' Donuts locations and operates under an Approved Bakery Manufacturing Agreement ("ABMA"), which is a third-party manufacturing agreement and not a franchise agreement. (PSUMF ¶¶ 4–5; DSUMF ¶¶ 2, 4.) Dunkin' Brands Group, Inc. ("Dunkin' Brands") does not have a direct ownership interest in the South CML. (PSUMF ¶ 4; *see also* DSUMF ¶ 6.)

On or about December 17, 2013, Chris Powers, the Senior Manufacturing Manager of Dunkin' Brands, informed non-party Sailesh "Sam" Patel, the lead board member of the South CML, that the South CML had been approved to supply Dunkin' Donuts products. (PRSUMF ¶ 6; DSUMF ¶ 6.) The South CML commenced operations in or around July 2014. (PRSUMF ¶ 7; DSUMF ¶ 7.) When it opened, the South CML had signed supply agreements with approximately

---

[3] These facilities are referred to as "CMLs."

80 Dunkin' Donuts franchises. (PRSUMF ¶ 8; DSUMF ¶ 8.) After opening, the South CML struggled to bring additional franchises on board as customers. (PSUMF ¶ 10.)

Alexander McCourt ("McCourt") was hired by Dunkin' Brands in or around July 2011 to be a Manufacturing Operations Manager. (PSUMF ¶ 6; DSUMF ¶ 10.) While working for Dunkin' Brands, McCourt became acquainted with Sam Patel and non-party Paresh Patel. (PSUMF ¶ 7; *see* Transcript of the Deposition of Paresh Patel ("Paresh Patel Dep. Tr.") 21:2–11, Ex. D to Pl.'s Am. Mot., ECF No. 40-7; *see* Transcript of the Deposition of Alexander McCourt ("McCourt Dep. Tr.") 43:7–22, Ex. C to Pl.'s Am. Mot., ECF No. 40-6.) Sam and Paresh Patel solicited McCourt's help with building the South CML facility. (PSUMF ¶ 7.) In or around November 2014, McCourt resigned his position with Dunkin' Brands after Sam and Paresh Patel recruited him to join the South CML as the Plant Manager. (PSUMF ¶¶ 11–12; DSUMF ¶ 11.) As Plant Manager, McCourt was the highest-ranking non-member of the South CML, and oversaw all production operations and participated in board meetings with Defendants and the remaining members of the South CML. (DSUMF ¶ 12.) McCourt never executed a formal employment agreement with the South CML and also never became a member of the LLC. (PSUMF ¶ 13; DSUMF ¶ 13.)

### 2. Development of the Central CML

In October or November of 2015, McCourt became interested in the prospect of opening his own central manufacturing facility, the Central CML near Trenton, New Jersey. (PSUMF ¶ 16; DSUMF ¶ 17.) During a meeting with a business associate, Christopher Fifis, McCourt learned of New Jersey's Grow NJ tax credit program, available for new businesses. (PSUMF ¶ 17; DSUMF ¶ 17.) McCourt believed the Central CML would be profitable if he was able to secure the tax credits from the Grow NJ program. (PRSUMF ¶ 17; DSUMF ¶ 17.) McCourt discussed the idea for the Central CML with Paresh Patel, who expressed interest in joining the project with him.

(PRSUMF ¶ 19; DSUMF ¶ 19.) McCourt and Paresh Patel began to search for potential locations for the Central CML. (PRSUMF ¶ 20; DSUMF ¶ 20.) McCourt and Patel did not mention their plans for the Central CML to Defendants at this time. (PRSUMF ¶ 20; DSUMF ¶ 20.)

On November 25, 2015, the Central CML was officially formed, with McCourt and Paresh Patel each possessing a 50% ownership share and McCourt serving as Chief Executive Officer. (PRSUMF ¶ 21; DSUMF ¶ 21.) Between its formation and June 2016, Defendants were entirely unaware of the Central CML and the actions of McCourt and Paresh Patel. (PRSUMF ¶ 23; DSUMF ¶ 23.) In December 2015, McCourt and Paresh Patel gave a tour of the South CML facility to Trenton mayor Eric Jackson and the President and CEO of the Trenton Chamber of Commerce, to promote the Central CML as an economic opportunity for the city of Trenton. (PSUMF ¶ 20; DSUMF ¶¶ 24–25.) Defendants, however, were at no point informed that such a tour had occurred. (PRSUMF ¶ 24; DSUMF ¶ 24.) On December 31, 2015, the Director of Trenton's Division of Economic and Industrial Development emailed McCourt and expressed excitement at the proposed Central CML project. (PRSUMF ¶ 26; DSUMF ¶ 26.) At some point prior to discussing his plans for the Central CML with Defendants, McCourt met with representatives of Bank of America about financing for the Central CML. (PRSUMF ¶ 27; DSUMF ¶ 27.)

On August 31, 2016, McCourt submitted an application for tax credits to the New Jersey Economic Development Authority ("NJEDA"), which operated the Grow NJ tax credit program. (PSUMF ¶¶ 21–22; DSUMF ¶ 29; *see also* Ex. F to Pl.'s Motion, ECF No. 40-9.) On October 14, 2016, the NJEDA approved McCourt's application and awarded the Central CML $18.9 million in tax credits (the "NJGROW Tax Credits") over a 10-year period. (PSUMF ¶ 23; DSUMF ¶ 29.) The NJGROW Tax Credits would be applied to the Central CML's payroll taxes for every employee that it hired. (PRSUMF ¶¶ 29, 78; DSUMF ¶ 29.)

4

### 3.    Defendants Learn of the Central CML

In June 2016, seven months after the formation of the Central CML, McCourt informed Defendants of its existence during a South CML board meeting. (PSUMF ¶  25; DSUMF ¶¶ 30–31.) On June 12, 2016, McCourt sent Defendants a pro forma, seeking investment in the Central CML in exchange for an ownership stake. (PSUMF ¶¶ 25–26; DSUMF ¶ 32; PRSUMF ¶¶ 32, 36.) By the terms of the pro forma, each Defendant would invest $350,000 and receive a 5% ownership stake in the Central CML in return. (PRSUMF ¶ 32; DSUMF ¶ 32.) The same pro forma called for McCourt to possess a 22% ownership stake and draw an annual salary of $771,461, without requiring him to make any capital contributions. (PRSUMF ¶ 32; DSUMF ¶ 32.) On July 30, 2016, McCourt circulated a revised pro forma, wherein each Defendant would receive a 6% ownership share in exchange for each Defendant investing $300,000. Under this proposal, McCourt would draw the same annual salary and receive a 21% ownership share, still without making capital contributions. (PRSUMF ¶ 32; DSUMF ¶ 32.)

On October 10, 2016, McCourt sent correspondence and a proposed business plan for the Central CML to Ronald Cumbee of Dunkin' Brands. (PRSUMF ¶ 37; DSUMF ¶ 37.) Defendants were not included in McCourt's correspondence, however, the proposed business plan indicated that the Central CML and South CML would combine training, development, and other resources. (PRSUMF ¶ 37; DSUMF ¶ 37; *see* Oct. 10, 2016 Correspondence and Business Plan *8,[4] Ex. P to Defs.' Mot, ECF No. 28-18.) The proposed business plan also stated that "[o]wnership is not the same between both [the Central and South CML] facilities." (Oct. 10, 2016 Correspondence and Business Plan *5.) On October 15, 2016, Dunkin' Brands former Senior Director of Global

---

[4] Page numbers preceded by an asterisk refer to the page number listed in the ECF header.

Manufacturing, Joseph Koudelka ("Koudelka")[5] sent an e-mail message to Paresh Patel stating, in relevant part, "[a]s we discussed last week, once we have the multi-year pro-forma starting with the base of 100 stores we will be able to finalize our review." (Oct. 15, 2016 Koudelka E-Mail Message, Ex. HH to Defs.' Mot., ECF No. 28-36.)[6]

### 4. The Consent Resolutions and the October 27, 2016 Letter

On or about October 21, 2016, Defendants and Sam Patel met and jointly decided they would not invest in or be involved with the Central CML. (DSUMF ¶ 39.) On the same day, Defendants and Sam Patel executed two resolutions (the "Consent Resolutions"), wherein the parties confirmed (1) they would not be "joining [the Central CML] in any capacity whatsoever"; (2) they would not join the Central CML as investors, LLC members, members of the management team, "or [maintain] any other affiliations whatsoever"; and (3) they would not use the Central CML "as their supplier for their currently (sic) or in future partially or fully owned retail Dunkin['] Donuts units provided that [the South CML] supplies [d]onuts to their future Dunkin['] Donuts units at prevailing donut price." (PSUMF ¶¶ 28–29; DSUMF ¶ 40; PRSUMF ¶ 40; *see* Consent Resolutions *3, Ex. R. to Defs.' Mot, ECF No. 28-20.)[7] Defendants and Sam Patel also resolved to "send a letter to Dunkin['] Brands and their officers emphasizing the financial consequences of opening up [the Central CML] to our current [South CML]." (Consent Resolutions *2.)

---

[5] Koudelka served as Senior Director of Global Manufacturing until December 2017. (PRSUMF ¶ 82; DSUMF ¶ 82.) Koudelka was responsible for evaluating proposals for new central manufacturing facilities. (PRSUMF ¶ 82; DSUMF ¶ 82.)

[6] The Court notes that Defendants repeatedly reference a November 8, 2016 e-mail message from Koudelka and reference it as being attached as Exhibit JJ. (*See, e.g.*, Defs.' Moving Br. 13, ECF No. 28-1.) Defendants, however, did not attach an Exhibit JJ to their motion and it does not appear anywhere else on the docket.

[7] Plaintiff's Statement of Undisputed Material Facts erroneously states that the Consent Resolutions were executed on October 27, 2016. (*See* PSUMF ¶¶ 27–28.)

On October 27, 2016, Defendants, through their counsel at the time, sent correspondence (the "October 27, 2016 Letter") to three Dunkin' Brands executives. (PSUMF ¶ 29; DSUMF ¶ 41; *see* Oct. 27, 2016 Letter, Ex. S to Defs.' Mot, ECF No. .) Attached to the October 27, 2016 Letter were the Consent Resolutions. (DSUMF ¶ 41; *see* Oct. 27, 2016 Letter.) The October 27, 2016 Letter stated, in relevant part,

> [Defendants] just learned that a central baking facility has been approved for a location in Trenton, New Jersey.
> [. . .]
> [The South CML] is not part of this proposed venture, nor were they consulted. . . . They confirm they are not involved in this new venture in any capacity. The proposed Trenton facility is not an extension of [the South CML] in any manner or fashion.
>
> The vast majority of the Members/Managers of [the South CML] are largely loyal Dunkin' Brands franchisees who have made significant investments in the [South CML]. The creation of a Trenton facility will directly impact their business operations and potentially cause them to suffer significant monetary losses.
>
> There is apparently some confusion about the nature and ownership of the Trenton facility. This indicates to [Defendants] that the true facts about the ownership may not have been fully understood by Dunkin' Brands. It does appear that a Member of [the South CML] is participating in such venture. However, he was not acting on behalf of the entity and any representation or impression to that effect would have been erroneous and/or misleading.
>
> [The South CML] would respectfully ask for an immediate review of this project. There is certainly no basis to damage loyal Dunkin' supporters who continue to work and improve the product and service. [The South CML] is certainly willing and able to handle additional capacity needs. [Defendants] verily believe[] that they could add significant additional capacity, thus making the need for the Trenton facility superfluous. [Defendants] would thus ask for your immediate attention to this matter.

(PSUMF ¶ 29; DSUMF ¶ 41; *see also* Oct. 27, 2016 Letter.)

### 5.     The Continued Development of the Central CML

After Defendants expressed their lack of interest in investing in the Central CML, McCourt and Paresh Patel continued to seek Dunkin' Brands approval of the Central CML. (PRSUMF ¶ 45; DSUMF ¶ 45.) On November 17, 2016, nearly a year after the formation of the Central CML, McCourt resigned from his position with the South CML. (DSUMF ¶ 21 n.2, ¶ 47.)[8] On or about November 23, 2016, Sam Patel—who had been a signatory on both the October 27, 2016 Letter and the Consent Resolutions—signed a partnership agreement (the "Partnership Agreement") with McCourt and Paresh Patel for the Central CML. (PSUMF ¶ 32[9]; DSUMF ¶ 48, n.3; *see generally* Partnership Agreement, Ex. V to Defs.' Mot., ECF No. 28-24.) Under the Partnership Agreement, Paresh Patel's uncle, Pravin Patel, would make a capital contribution of $1.2 million in exchange for an 18% ownership interest. (PRSUMF ¶ 48; DSUMF ¶ 48.) McCourt would receive a 24% ownership stake without making any capital contribution. (PRSUMF ¶ 48; DSUMF ¶ 48.) Pravin Patel testified, however, that he never knew about the Partnership Agreement, never signed it, never actually provided any funding to the Central CML, and was never asked to make a $1.2 million contribution. (PRSUMF ¶ 49; DSUMF ¶ 49.)

---

[8] The Court notes that although Plaintiff's Complaint and Plaintiff's Statement of Undisputed Material Facts both assert that McCourt stepped down from the South CML in "early 2016," the record indicates he did not resign until November 17, 2016. (Compare Compl. ¶ 25, PSUMF ¶ 16 *with* Nov. 17, 2016 McCourt Email, Ex. J to DSUMF, ECF No. 28-12.)

[9] The Court notes that, after a single additional paragraph, Plaintiff's recitation of material facts concludes with this event. (*See generally* PSUMF.) Defendants' recitation of material facts, however, continues an additional 55 paragraphs. (*See generally* DSUMF.) Plaintiff's Responsive Statement of Material Facts and Counter-Statement of Material Facts addresses the remaining paragraphs of Defendants' submissions and either characterizes them as "[a]dmitted," or sets forth Plaintiff's dispute. (*See generally* PRSUMF.) The Court, therefore, only references those two documents for the remainder of this section.

Under the Partnership Agreement, Sam Patel agreed to (1) "bring on board all [South CML] members to endorse [the Central CML] project with Dunkin' Brands"; (2) "help secure bank financing of $11,500,000.00"; and (3) meet with Koudelka. (PRSUMF ¶ 50; DSUMF ¶ 50; *see also* Partnership Agreement.) Sam Patel never informed Defendants that he was a signatory to the Partnership Agreement, either before or after its execution. (PRSUMF ¶ 51; DSUMF ¶ 51.)

In or around early-December 2016, Sam Patel and Paresh Patel met with Koudelka. (PRSUMF ¶ 52; DSUMF ¶ 52.) Sam Patel informed Koudelka that he would once again attempt to convince Defendants to join the Central CML. (PRSUMF ¶ 52; DSUMF ¶ 52.) Koudelka noted that the Central CML would need commitments from at least 75 stores to secure approval from Dunkin' Brands. (PRSUMF ¶ 52; DSUMF ¶ 52.) Sam Patel did not inform Defendants he was making this trip or that he made any representations about them or their intentions to Koudelka. (DSUMF ¶ 54.) In or around December 2016, Paresh Patel removed himself as a member of the Central CML. (PRSUMF ¶ 56; DSUMF ¶ 56.) In late 2016, McCourt attempted to secure financing for the Central CML and executed a Memorandum of Understanding with Capital Solutions, Inc. to purchase and lease a production facility to the Central CML. (PRSUMF ¶ 57; DSUMF ¶ 57.) Ultimately, McCourt never secured a bank loan and no outside investors ever invested in the Central CML. (PRSUMF ¶ 58; DSUMF ¶ 58.)

On January 25, 2017, McCourt informed Paresh Patel he was abandoning the Central CML project and surrendering the $18.9 million in NJGROW Tax Credits because "other companies [he had] been working with [had] not developed in time for [McCourt] to stay with [the] Trenton deal." (PRSUMF ¶ 59; DSUMF ¶ 59; *see also* Jan. 25, 2017 McCourt Email Message, Ex. Y to Defs.' Mot ECF No. 28-27.) McCourt also asked Paresh Patel to see if McCourt would be able to return

to the South CML. (PRSUMF ¶ 59; DSUMF ¶ 59; *see also* Jan. 25, 2017 McCourt Email Message.)[10]

On or about February 16, 2017, McCourt again began working on the Central CML project. (PRSUMF ¶ 60; DSUMF ¶ 60.) He emailed Paresh Patel and Sam Patel and referenced that Sam Patel was working on a new proposal for the Central CML. (PRSUMF ¶ 60; DSUMF ¶ 60; *see also* Feb. 16, 2017 E-mail Message Chain, Ex. Z to Defs.' Mot, ECF No. 28-28.) McCourt noted that, in order to secure a partnership with a specific wholesale company, Sam Patel would have to secure the interest and investment of Defendants. (PRSUMF ¶ 60; DSUMF ¶ 60; *see also* Feb. 16, 2017 E-mail Message Chain.) On or about March 23, 2017, McCourt told representatives of the NJEDA that he was continuing to attempt to secure Defendants' endorsement of the Central CML project. (PRSUMF ¶ 61; DSUMF ¶ 61.) After this meeting, McCourt took no further steps to advance the project. (DSUMF ¶ 62.)[11]

On or about December 28, 2017, the NJEDA sent McCourt correspondence stating that its obligation to provide the NJGROW Tax Credits had expired on October 14, 2017 because the Central CML had failed to provide the NJEDA with the required documentation, which was a

---

[10] The Court notes that it is unclear from the record whether Paresh Patel ever followed up on McCourt's request or whether any further steps relating to McCourt potentially rejoining the South CML were taken.

[11] Plaintiff contests this assertion. (*See* PRSUMF ¶ 62.) Plaintiff's contention, however, is contradicted by McCourt's own deposition testimony, which reads, in relevant part,

> Q. So after you walked out the door from [the March 23, 2017] meeting, is it fair to say you took absolutely no steps to advance the [Central CML] project?
>
> A. That would be accurate, yeah.

(McCourt Dep. Tr. 217:12–24.) The Court, accordingly, finds Plaintiff's objection to be without merit.

condition of approval. (PRSUMF ¶ 63; DSUMF ¶ 63; NJEDA Correspondence, Ex. BB to Defs.' Mot, ECF No. 28-30.)

Plaintiff admits that Dunkin' Brands never approved or denied the Central CML's proposal to operate a central manufacturing location in Trenton. (PRSUMF ¶ 64; DSUMF ¶ 64.) McCourt has also not followed up with Dunkin' Brands to determine whether Dunkin' Brands would have approved or rejected the Central CML. (PRSUMF ¶ 65; DSUMF ¶ 65.)

### B.   Disputed Facts

Defendants dispute Plaintiff's assertion that the South CML "service[s] an[] area of approximately 555 stores," of which about 150 do not receive their product from large kitchens, and "[o]f the remaining 400+ stores in the general Ballmahr (sic) geographic market area, [the South CML] services in excess of 50% of those stores and, consequently, possesses significant market share and is able to exercise broad market power." (PSUMF ¶ 15; Defendants' Response to Plaintiff's Statement of Material Facts ("DRSUMF") ¶ 15, ECF No. 44-1.) In particular, Defendants dispute the assertion that they have "broad market power." (DRSUMF ¶ 15.) Defendants also dispute Plaintiff's contention that the NJGROW Tax Credits "were estimated to generate $12 to $14 million in revenue if sold on the secondary market." (DRSUMF ¶ 24; PSUMF ¶ 24.)

Plaintiff disputes Defendants' characterization regarding the circumstances of Mayor Eric Jackson's visit to the South CML. (PRSUMF ¶¶ 24–25; DSUMF ¶¶ 24–25.) Plaintiff asserts that, prior to Mayor Jackson's visit, there was no requirement that members of the South CML had to obtain permission prior to bringing a non-family member to the facility. (PRSUMF ¶¶ 24–25; DSUMF ¶¶ 24–25.) Plaintiff also contest Defendants assertion that on or around April 29, 2016 (the "April 29 Amendment"), Defendants, Sam Patel, and Paresh Patel executed an amendment to

11

the South CML operating agreement under which the parties agreed "not to directly or indirectly own, manage, operate[], control, be employed by, finance or participate in, consult with or for, or be connected with any business in competition with [the South CML] for a period of five years from divestiture from [the South CML]." (DSUMF ¶ 28; PRSUMF ¶ 28.) Rather, Plaintiff asserts that Paresh Patel was never presented with nor signed the alleged April 29 Amendment. (PRSUMF ¶ 28.)[12]

### C.     Procedural History

On December 6, 2017, Plaintiff filed a four-count Complaint[13] against Defendants: Count One, for violations of section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and section 4 of the Clayton Act, 15 U.S.C. § 15 (Compl. ¶¶ 51–67, ECF No. 1); Count Two, for violations of the New Jersey Antitrust Act, N.J. Stat. Ann. §§ 56:9-1, *et seq.* (*Id.* ¶¶ 68–76); Count Three for common law tortious interference (*Id.* ¶¶ 77–86); and Count Four for common law civil conspiracy (*Id.* ¶¶ 87–90). On February 5, 2018, Defendants answered the Complaint. (ECF No. 16.)

On March 8, 2018, the Honorable Douglas E. Arpert, U.S.M.J., entered the Pretrial Scheduling Order, with fact discovery set to close on November 1, 2018 and motions to amend or add new parties due by September 28, 2018. (ECF No. 18.) Fact discovery was extended to December 31, 2018 by Judge Arpert's Final Scheduling Order. (ECF No. 22.)

On February 21, 2019, Plaintiff filed a Motion to Amend his Complaint (ECF No. 27), seeking to add non-party Sam Patel as a named defendant, which Defendants opposed (ECF No. 30). On February 22, 2019, the parties filed cross-motions for summary judgment. (ECF Nos. 28,

---

[12] The Court notes that Plaintiff agrees, however, that "[D]efendants never took any action on this alleged amendment." (PRSUMF ¶ 28.)

[13] Plaintiff's Complaint also named "XYZ Corp[s]. 1–5", "ABC, LLC[s] 1–5", "John Does 1–10", and "Jane Does 1–10" as defendants. (*See generally* Compl., ECF No. 1.)

29.) On March 18, 2019, Judge Arpert held oral argument on Plaintiff's Motion to Amend and entered an order denying the motion. (ECF Nos. 37–38.)

On September 6, 2019, the Court dismissed Plaintiff's Motion for Summary Judgment for failure to include a statement of material facts not in dispute, in violation of Local Civil Rule 56.1(a). (Sept. 6, 2019 Order, ECF No. 39.) The Court also administratively terminated Defendants' Motion for Summary Judgment, pending Plaintiff refiling their motion in accordance with the Local Civil Rules.

On October 4, 2019, Plaintiff filed an Amended Motion for Summary Judgment. (ECF No. 40.) On October 9, 2019, the Court entered a Letter Order reinstating Defendants' Motion for Summary Judgment. (ECF No. 43.)

## II.   **PARTIES' POSITIONS**

The parties dispute whether the Court should employ the *per se* standard or the "rule of reason" standard in its analysis of the antitrust claims. Plaintiff advocates for the Court to use the *per se* standard, while Defendants contend that the "rule of reason" is proper. The Court addresses these arguments in section IV, *infra*, and here recites the remainder of the parties' substantive arguments.

### A.   **Plaintiff's Position**

Plaintiff contends that Defendants committed antitrust violations and entered into a horizontal agreement and group boycott when they executed the Consenting Resolutions not to join or do business with the Central CML. (Pl.'s Moving Br. 4, ECF No. 40.) Plaintiff avers that the October 27, 2016 Letter is further evidence of this impermissible agreement and boycott. (*Id.*) Plaintiff claims that Defendants "withheld doing business with the [Central CML] in order to extract a higher percentage ownership [share] from the [Central CML] for their initial capital

contributions." (*Id.* at 5.) Plaintiff further contends that Defendants refused to do business with the Central CML out of a fear that its entry into the marketplace would cause economic damage to the South CML by way of increased competition. (*Id.* at 6.)

As to its tortious interference claim, Plaintiff argues that it "had an anticipated economic benefit in that it was seeking to construct and open a central manufacturing facility that, as demonstrated by the success of the [South CML], could be potentially lucrative." (*Id.* at 9.) Plaintiff contends that Defendants intentionally interfered with this potential economic advantage, and points to the October 27, 2016 Letter as proof. (*Id.* at 9–10.) Plaintiff contends that it had a reasonable expectation of receiving this economic benefit because: (1) "[a]n area for the facility had been sourced and the NJGROW [T]ax [C]redits had been awarded" and (2) Plaintiff was "in the process of obtaining [] start-up capital." (*Id.* at 10.) Plaintiff asserts it suffered injury in the form of the lost NJGROW Tax Credits and the "lapsing of its real estate deal" to purchase a site for the proposed facility. (*Id.*)

The Court notes that, apart from a single sentence averring that the October 27, 2016 Letter was an overt act in furtherance of a civil conspiracy, Plaintiff's Motion never addresses the civil conspiracy claim asserted in Plaintiff's Complaint. (*See generally id.*)

### B.    Defendants' Position

Defendants argue there is no basis for Plaintiff's claims and assert that they did not form a group boycott of the Central CML, did not engage in anti-competitive behavior, and did not make material misrepresentations to Plaintiff. (Defs.' Moving Br. 1, ECF No. 28-1.) Rather they contend they simply did not wish to invest in or be involved with the Central CML. (*Id.*) Defendants assert that McCourt and Paresh Patel surreptitiously formed the Central CML and did not inform

Defendants of its existence for nearly seven months. (*Id.*) Indeed, McCourt was still working for the South CML while simultaneously developing the Central CML. (*Id.*)

Defendants aver that they did not engage in anti-competitive behavior, but simply did not want to join the Central CML because McCourt sought a $350,000 individual investment in exchange for only a 5% ownership share. (*Id.* at 2.) The October 27, 2016 Letter, was not anti-competitive because they did not demand that Dunkin' Brands reject the Central CML's proposal. (*Id.*) Instead they sought to clarify that the South CML was not involved with the Central CML. (*Id.*) Defendants also point out that Plaintiff only brought this action against them and did not name Sam Patel as a defendant, even though he was the one who made misrepresentations to McCourt about Defendants' interest in the Central CML. (*Id.* at 3.)

Defendants argue they did not engage in a horizontal boycott because a horizontal boycott is an agreement between competitors and Defendants are all members of the same limited liability company and, as such, are not competitors. (*Id.*) Because Defendants did not engage in any unlawful anti-competitive behavior, Defendants argue that Plaintiff's claims for tortious interference and civil conspiracy fail. (*Id.*)

## III.   **LEGAL STANDARD**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To reach this decision, "the Court must determine "whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine [dispute] of material fact.'" *Lamberson v. Pennsylvania*, 561 F. App'x 201, 206 (3d Cir. 2014) (quoting *Macfarlan v. Ivy Hill SNF, L.L.C.*, 675 F.3d 266, 271 (3d Cir. 2012)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

"In evaluating the evidence, the Court must consider all facts and their logical inferences in the light most favorable to the non-moving party." *Rhodes v. Marix Servicing, LLC*, 302 F. Supp. 3d 656, 661 (D.N.J. 2018) (citing *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002)). "While the moving party bears the initial burden of proving an absence of a genuine dispute of material fact, meeting this obligation shifts the burden [t]o the non-moving party to 'set forth specific facts showing that there is a genuine [dispute] for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 250). "Unsupported allegations, subjective beliefs, or argument alone . . . cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019). "Thus, if the nonmoving party fails 'to make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be no genuine [dispute] of material fact . . . .'" *Id.* (quoting *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quotation marks omitted)). "In considering the motion, the Court 'does not resolve factual disputes or make credibility determinations.'" *Rhodes*, 302 F. Supp. 3d at 661 (quoting *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995)). "When ruling on cross-motions for summary judgment, the court must consider the motions independently, and view the evidence on each motion in the light most favorable to the party opposing the motion." *Einhorn v. Kaleck Bros.*, 713 F. Supp. 2d 417, 421 (D.N.J. 2010) (internal quotations and citation omitted).

## IV.   DISCUSSION

### A.   The Appropriate Antitrust Standard

As a preliminary matter, the Court considers whether to evaluate Plaintiff's antitrust claims under the *per se* standard or pursuant to the "rule of reason." The Supreme Court first articulated these two standards in *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978), where it stated,

> There are [] two complementary categories of antitrust analysis. In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are "illegal *per se*." In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed.

*Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 692 (emphasis in original).

Under the rule of reason standard, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (quoting *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977)). "Appropriate factors to take into account include specific information about the relevant business and the restraint's history, nature, and effect." *Id.* (citation and quotations omitted). "Whether the businesses involved have market power is a further, significant consideration." *Id.* at 885–86 (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (equating the rule of reason standard with "an inquiry into market power and market structure designed to assess [a restraint's] actual effect").

"The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work."

*Leegin Creative Leather Prods.*, 551 U.S. at 886 (citing *Bus. Elecs. Corp. v. Sharp Elects. Corp.*, 485 U.S. 717, 723 (1988). "Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices." *Id.* (citations omitted). "To justify a *per se* prohibition a restraint must have manifestly anticompetitive effects, and lack . . . any redeeming virtue." *Id.* (internal quotations and citations omitted). The Supreme Court has "expressed reluctance to adopt *per se* rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Id.* at 887 (citing *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). A "departure from the rule[]of[]reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." *Id.* (citing *Cont'l T.V.*, 433 U.S. at 58–59). "[P]recedent limits the *per se* rule in the boycott context to cases involving horizontal agreements *among direct competitors*." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (emphasis added); *see also Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 463 (3d Cir. 1998) (noting that "it is clear that assigning the label 'group boycott' to a concerted refusal to deal with a distributor does not have a talismanic effect, automatically bringing the case under the *per se* rubric."). A horizontal boycott "occurs among competitors *at the same level of market structure*, whereas [a vertical boycott] involves combinations of business organizations at different levels." *State v. Lawn King, Inc.*, 404 A.2d 1215, 1218 (N.J. Super. Ct. App. Div. 1979), *aff'd*, 417 A.2d 1025 (N.J. 1980) (emphasis added) (citing *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)).

An analysis of claims for violations of the New Jersey Antitrust Act similarly use the rule of reason or the *per se* standard. *See Glasofer Motors v. Osterlund, Inc.*, 433 A.2d 780, 788 (N.J. Super. Ct. App. Div. 1981); *see also Oates v. E. Bergen Cty. Multiple Listing Serv., Inc.*, 273 A.2d

795, 801 (N.J. Super. Ct. Ch. Div. 1971) ("[A]pplication of the *[p]er se* concept is now called for in New Jersey.").

Plaintiff characterizes Defendants' actions as a "group boycott" and argues the Court should employ the *per se* standard. (Pl.'s Moving Br. 2.) In support, Plaintiff primarily relies on two cases: *Fashion Originators' Guild of America, Inc. v. Federal Trade Commission*, 312 U.S. 457 (1941), and *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959). (*See* Pl.'s Moving Br. 2–3.) Both cases were decided decades before *National Society of Professional Engineers*, and, despite Plaintiff's assertions, neither actually involved a horizontal boycott. The plaintiffs in *Fashion Originators'* were a collection of groups and individuals who designed, manufactured, and sold women's garments and other textiles. *Fashion Originators' Guild of Am.*, 312 U.S. at 461. Plaintiffs admitted that "to destroy such competition they ha[d] in combination purposely boycotted and declined to sell their products *to retailers* who follow a policy of selling garments copied by other manufacturers from designs put out by Guild members." *Id.* (emphasis added). This boycott, therefore, was not a horizontal boycott amongst competitors, but rather a vertical one. The factual circumstances of *Klor's* are similarly inapposite with the present case. The complaint in *Klor's* alleged a boycott consisting of "a wide combination consisting of manufacturers, distributors and a retailer." *Klor's*, 359 U.S. at 213. Once again, this describes a vertical rather than a horizontal boycott.

The Court finds Plaintiff's arguments unconvincing. *See Khan*, 522 U.S. at 22 ("[V]ertical maximum price fixing, like the majority of commercial arrangements subject to the antitrust laws, should be evaluated under the rule of reason.") Critically, the Supreme Court has limited the application of the *per se* standard to instances "involving horizontal agreements *among direct competitors*." *NYNEX Corp.*, 525 U.S. at 135 (emphasis added). Here, Defendants are members of

the same limited liability company, the South CML, and therefore, in this context, are not direct competitors with each other. Plaintiff also cites no case law that stands for the proposition that members of an LLC can also be classified as competitors. Additionally, Plaintiff has not alleged, let alone proven, that Defendants engaged with its competitors to conduct a boycott of the Central CML. The Court, accordingly, analyzes Plaintiff's antitrust claims under the rule of reason.

## B.     Plaintiff's Motion for Summary Judgment[14]

The Court now turns to Plaintiff's Motion for Summary Judgment and views the evidence in the light most favorable to Defendants.

### 1.     Count One: Violations of the Sherman Antitrust Act and Clayton Act

Section 2 of the Sherman Antitrust Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a).

---

[14] The Court's September 6, 2019 Order highlighted that Plaintiff's original Motion for Summary Judgment did not contain a Table of Authorities, in violation of Local Civil Rule 7.2(b), and only cited cases decided between 1911 and 1997. (Sept. 6, 2019 Order, ECF No. 39 at 2 n.1.) The Court ordered, *inter alia*, that the parties e-file a certification "attesting to the fact that the case law cited in their supporting legal briefs includes the most recent authority from the United States Supreme Court, United States Court of Appeals for the Third Circuit, and the United States District Court. . . ." (*Id.* ¶ 3.) The Court notes that Plaintiff's Amended Motion for Summary Judgment does not include such a certification, does not contain a Table of Authorities, and only cites cases decided between 1890 and 1990. (*See generally* Pl.'s Am. Mot., ECF No. 40.) Defendants' Motion contains such a certification and a Table of Authorities. (*See generally* Defs.' Mot., ECF No. 28.)

"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 406 (3d Cir. 2016) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).[15] "In turn, the offense of attempted monopolization has the following three elements: (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 75 (3d Cir. 2010) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). "The final element requires an inquiry into the relevant product and geographic market as well as the defendant's economic power in that market." *Id.* (citation omitted).

Section 2 of the Sherman Antitrust Act also requires that a plaintiff demonstrate it suffered an antitrust injury. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 269 (3d Cir. 2012) (noting both Sherman Act Sections 1 and 2 require showing antitrust injury). An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). To establish antitrust injury, a plaintiff must show a "causal connection between the purportedly unlawful conduct and the injury." *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998).

---

[15] The Court notes that Plaintiff's Moving Brief fails to even state the elements of a claim brought under Section 2 of the Sherman Antitrust Act. (*See generally* Pl.'s Moving Br.)

Here, there is no evidence in the record to support the assertion that Defendants currently possess a monopoly in the relevant geographic market. Plaintiff's Moving Brief is similarly devoid of argument to this effect. Indeed, the South CML's direct competitor, South Jersey Bakery, LLC, is located in West Deptford, New Jersey, less than 10 miles from the South CML. (DSUMF ¶ 15; PRSUMF ¶ 15.) The Court finds, therefore, that Plaintiff has failed to make a sufficient showing to establish the elements of a monopoly.

Plaintiff's evidence for an attempted monopolization is similarly lacking. Plaintiff rests its entire argument on the October 27, 2016 Letter and the attached Consent Agreements. However, the record contains no evidence that the October 27, 2016 Letter was sent with the specific intent to monopolize or that the South CML had a dangerous probability of achieving monopoly power. While the October 27, 2016 Letter expressed financial concerns that Defendants had relating to the proposed Central CML, they did not request or demand that Dunkin' Brands reject the Central CML's proposal. Instead, they primarily sought to clarify their lack of involvement with and endorsement of the Central CML. (*See also* Oct. 27, 2016 Letter ("[The South CML] is not part of this proposed venture, nor were they consulted. . . . They confirm that they are not involved in this new venture in any capacity. The proposed Trenton facility is not an extension of [the South CML] in any manner or fashion.")). Although the October 10, 2016 Correspondence and Business Plan that McCourt sent Dunkin' Brands indicated that the ownership of the Central and South CML's was different, it also stated that the two groups would be sharing training resources and would otherwise be associated with each other. (*See* Oct. 10, 2016 Correspondence and Business Plan *7–8.)

The Court also finds the record fails to establish a causal link between Plaintiff's alleged injury and Defendants' actions. McCourt attributed the failure to open the Central CML to several

factors: (1) the hostile relationship between Sam Patel and Paresh Patel; (2) the misinformation Sam Patel provided McCourt regarding the communications Sam Patel had with Defendants relating to joining the Central CML; (3) McCourt's decision to withhold information about the Central CML from Defendants led to Defendants not wanting to be involved because "they felt like [McCourt] did something behind their back"; (4) his inability to secure contracts with the requisite number of stores to obtain approval from Dunkin' Brands; and (5) the October 27, 2016 Letter. (McCourt Dep. Tr. 80:22–84:9.)

McCourt admitted, however, that an existing CML does not have the power to veto or stop Dunkin' Brands from approving a new CML, and that Dunkin' Brands could still approve a new CML even if it received a letter from an existing CML objecting to the approval. (McCourt Dep. Tr. 68:1–10.) Indeed, Jeffrey L. Karlin, who is employed by Dunkin' Brands as Director & Legal Counsel, stated in his affidavit that "[n]either the Defendants in this action, nor any members of any other CML, have a role in Dunkin' Brands' CML approval process." (Affidavit of Jeffrey L. Karlin ("Karlin Aff.") ¶ 5, ECF No. 28-38.)

As to the October 27, 2016 Letter, there is no evidence in the record that Dunkin' Brands would have approved the Central CML if not for the Letter and there is no evidence the Letter in any way influenced its approval decision. In fact, Dunkin' Brands never actually approved or rejected the Central CML proposal. (Karlin Aff. ¶ 6.) On October 15, 2016, Koudelka sent an e-mail message to Paresh Patel stating, in relevant part, "[a]s [we] discussed last week, once we have the multi-year pro-forma starting with the base of 100 stores we will be able to finalize our review." (Oct. 15, 2016 Koudelka E-Mail Message.) McCourt stated that he "was working off the premise that 30 stores" from the South CML would be joining the Central CML. (McCourt Dep. Tr. 35:16–36:18.) McCourt based this assumption not on representations made by Defendants, but

on statements made to him by non-parties Sam Patel and Paresh Patel. (*Id.*) Indeed, McCourt admitted that the Central CML had secured "zero" signed service agreements with Dunkin' Donuts franchisees. (*Id.* McCourt Dep. Tr. 35:7–9.) Jeffrey Karlin averred in his affidavit that "Dunkin' Brands has never approved, and will not approve, a proposal for a CML when the proposed CML has no commitments from Dunkin' franchisees to enter into service agreements with it." (Karlin Aff. ¶ 8.) "Dunkin' Brands generally requires a proposed CML to have service agreements with enough Dunkin' franchisees that the facility will be able to provide goods to the franchisees at a reasonable cost." (*Id.* ¶ 9.)

Plaintiff also argues, without proffering any evidentiary support, that "the actions of the [D]efendants have potentially impacted either directly or indirectly market prices." (Pl.'s Moving Br. 8.) "The [Central CML], by virtue of its award of the NJGROW [T]ax [C]redits . . . would have been able to innovate and build a state-of-the-art facility that would have permitted it to deliver a cheaper cost[-]per[-]dozen product to the marketplace." (*Id.*)

Plaintiff's argument is unconvincing. There is no evidence in the record that Defendants' actions contributed to Plaintiff's loss of the NJGROW Tax Credits, nor that Dunkin' Donuts had conditioned its approval of the Central CML on Plaintiff securing such tax credits. Rather, the NJGROW Tax Credits were conditional, and required the Central CML to meet certain requirements prior to final approval. McCourt admitted that the Central CML failed to satisfy these conditions. In particular, the Central CML failed to provide the NJEDA with: (1) a copy of the site plan approval, (2) a copy of the committed financing for the project, and (3) documentation evidencing that Central CML had control of the site of the qualified business facility. (McCourt Dep. Tr. 193:11–194:11.) McCourt also acknowledged that he knew the tax credits would expire if he failed to provide the required documentation. (*Id.* 195:10–20.) Moreover, McCourt admitted

that he never corresponded with Dunkin' Brands regarding the expiration date of the tax credits because he "didn't feel like [he] needed to." (*Id.* 195:21–196:3.)

There is no evidence in the record that Defendants' actions constituted an attempt at monopolization, Defendants' actions were causally linked to Plaintiff's alleged injuries, or that Defendants prevented the Central CML from meeting the requirements of the NJEDA and Dunkin' Brands. The Court, accordingly, denies Plaintiff's Motion for Summary Judgment as to Count One.

### 2.   Count Two: Violations of the New Jersey Antitrust Act

New Jersey state courts look to federal case law when interpreting the New Jersey Antitrust Act. *Patel v. Soriano*, 848 A.2d 803, 826 (N.J. Super. Ct. App. Div. 2004) ("We look to federal jurisprudence to guide our interpretation of the [New Jersey Antitrust] Act."); *see also Van Natta Mech. Corp. v. Di Staulo*, 649 A.2d 399, 406 (N.J. Super. Ct. App. Div. 1994) ("There are few New Jersey cases interpreting the [New Jersey Antitrust] Act, and we must look to federal cases for guidance. This is expressly permitted by the Act."). Indeed, the New Jersey Antitrust Act states that it "shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it." N.J. Stat. Ann. § 56:9-18.

Having found that Plaintiff is not entitled to summary judgment on its federal antitrust claims in Count One, the Court similarly concludes that Plaintiff is not entitled to summary judgment on its New Jersey Antitrust claims. Plaintiff's Motion for Summary Judgment, as to Count Two, is therefore denied.

### 3.    Count Three: Tortious Interference

Federal courts apply New Jersey state law to tortious interference claims. *See Avaya Inc., RP*, 838 F.3d at 373 (applying New Jersey state law to claim of tortious interference). "An action for tortious interference with a prospective business relation protects the right to pursue one's business, calling or occupation free from undue influence or molestation." *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 36 (N.J. 1989) (internal quotation omitted). "What is actionable is [t]he luring away, by devious, improper and unrighteous means, of the customer of another." *Id.* (internal quotation omitted). "[I]n tortious interference cases involving parties in direct competition in the same market, the line must be drawn where one competitor interferes with another's economic advantage through conduct which is fraudulent, dishonest, or illegal." *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 659 A.2d 904, 936 (N.J. Super. Ct. App. Div. 1995). To prevail on a claim for tortious interference, a plaintiff must show: (1) "that it had a reasonable expectation of economic advantage, (2) which was lost as a direct result of [the defendant's] malicious interference, and (3) that it suffered losses thereby." *Avaya Inc., RP*, 838 F.3d at 382 (citing *Ideal Dairy Farms, Inc.*, 659 A.2d at 932). Causation is also required for the tortious interference claim. *See Kern v. Med. Protective Co., Inc.*, No. 13-2286, 2018 WL 4502187, at *10 (D.N.J. Sept. 20, 2018).

Plaintiff argues it had "an anticipated economic benefit in that it was seeking to construct and open a [CML] that, as demonstrated by the success of the South Jersey CML, could potentially be lucrative." (Pl.'s Moving Br. 9.) Plaintiff further avers that "[i]t is also clear that [Defendants'] interference . . . was done intentionally." (*Id.*) In support of its argument that it had a reasonable probability of success, Plaintiff avers that "the wheels were clearly in motion. An area for the facility had been sourced and the NJGROW [T]ax [C]redits had been awarded." (*Id.* at 10.)

Plaintiff avers that the injury it suffered was "the loss of the [NJGROW] [T]ax [C]redit funding and the lapsing of its real estate deal seeking to purchase the proposed facility site." (*Id.*)

Plaintiff's argument is wholly unsupported by the record before the Court. In paragraph 81 of its Complaint, Plaintiff alleges, "[a]t all relevant times . . . the [D]efendants knew of the [Central CML's] valid and legally enforceable contractual and prospective contractual relationships with third parties, including, but not limited to, Dunkin['] Brands." (Compl. ¶ 81.) The record is devoid of any such evidence. As discussed above, while the Central CML was awarded NJGROW Tax Credits, those credits were conditioned upon the satisfaction of various criteria which McCourt has admitted the Central CML failed to satisfy. Plaintiff's reliance on the October 27, 2016 Letter as evidence of Defendants' malicious actions is similarly misplaced. The October 27, 2016 Letter contained nothing that could be described as fraudulent, dishonest, or illegal. Indeed, Defendants did not ask or demand that Dunkin' Brands reject the Central CML proposal.

A plaintiff demonstrates causation if it establishes "proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Printing Mart-Morristown*, 563 A.2d at 41 (internal quotations omitted). Plaintiff similarly fails to establish causation. Dunkin' Brands and Koudelka repeatedly communicated to Plaintiff that in order to secure approval it would be required to secure service agreements with roughly 100 Dunkin' Donuts stores. As discussed above, McCourt admitted that the Central CML had secured "zero" signed service agreements with Dunkin' Donuts franchisees.

Plaintiff has failed to establish entitlement to judgment on its tortious interference claim. The Court, accordingly, denies Plaintiff's Motion for Summary Judgment as to Count Three.

### 4. Count Four: Civil Conspiracy[16]

In New Jersey, a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Repetti v. Vitale*, No. A-0424-10T2, 2011 WL 3962518, at *4 (N.J. Super. Ct. App. Div. Sept. 9, 2011) (quoting *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005)). In New Jersey, civil conspiracy "is not an independent cause of action, but rather a liability expanding mechanism which exists only if [plaintiffs] can prove the underlying independent wrong." *Tadros v. City of Union City*, No. 10-2535, 2011 WL 1321980, at *9 (D.N.J. Mar. 31, 2011) (internal quotations omitted) (citing *Farris v. Cty. of Camden*, 61 F. Supp. 2d 307, 331 (D.N.J. 1999)).

Here, the Court has found that Plaintiff has failed to prove Defendants violated federal or state antitrust laws, and also failed to prove its claim of tortious interference. The Court, accordingly, finds that Plaintiff's civil conspiracy claim also fails. *See, e.g.*, *Hunter v. Sterling Bank, Inc.*, No. 09-172, 2011 WL 5921388, at *9 (D.N.J. Nov. 28, 2011) (finding that plaintiffs' civil conspiracy claim must be dismissed because plaintiffs could not sustain their claim for common law fraud, the sole basis of their conspiracy claim); *Farris*, 61 F. Supp. 2d at 326 (same). The Court, therefore, denies Plaintiff's Motion for Summary Judgment as to Count Four.

### C. Defendants' Motion for Summary Judgment

The Court now turns to Defendants' Motion for Summary Judgment and views the evidence in the light most favorable to Plaintiff. The Court finds, however, that its evaluation of

---

[16] The Court also notes that, other than a single sentence, Plaintiff's Moving Brief does not address its civil conspiracy claim. (*See generally* Pl.'s Moving Br.)

the evidence and the record is not changed, despite drawing all reasonable inferences in favor of Plaintiff.

        1.     **Count One: Violations of the Sherman Antitrust Act and Clayton Act**

Despite drawing all inferences in Plaintiff's favor, the Court finds Plaintiff has failed to establish the requisite elements of a violation of the Sherman Antitrust Act. The record contains no evidence that the October 27, 2016 Letter was sent with the specific intent to monopolize or that the South CML had a dangerous probability of achieving monopoly power. Indeed, McCourt's own communications with Dunkin' Brands contained misrepresentations relating to the South CML's involvement with and endorsement of the Central CML.

As discussed above, McCourt attributes the failure to open the Central CML to several factors: (1) the hostile relationship between Sam Patel and Paresh Patel; (2) the misinformation Sam Patel provided McCourt regarding the communications Sam Patel had with Defendants relating to joining the Central CML; (3) McCourt's decision to withhold information about the Central CML from Defendants led to Defendants not wanting to be involved because "they felt like [McCourt] did something behind their back"; (4) his inability to secure contracts with the requisite number of stores to obtain approval from Dunkin' Brands; and (5) the October 27, 2016 Letter. (McCourt Dep. Tr. 80:22–84:9.) McCourt admitted, however, that an existing CML does not have the power to veto or stop Dunkin' Brands from approving a new CML, and that Dunkin' Brands could still approve a new CML even if it received a letter from an existing CML objecting to the approval. (McCourt Dep. Tr. 68:1–10.) Dunkin' Brands' Director & Legal Counsel confirmed that "[n]either Defendants in this action, nor any members of any other CML, have a role in Dunkin' Brands' CML approval process." (Karlin Aff. ¶ 5.)

Even assuming, *arguendo*, that the October 27, 2016 Letter influenced Dunkin' Brands in some way, the Letter did not impact McCourt's ability to secure signed service agreements, as required for CML approval, or submit the required documentation, as required to secure the NJGROW Tax Credits—both of which McCourt admitted he failed to do. "Dunkin' Brands has never approved, and will never approve, a proposal for a CML when the proposed CML has no commitments from Dunkin' franchisees to enter into service agreements with it." (Karlin Aff. ¶ 8.) A plaintiff alleging an antitrust violation must show a "causal connection between the purportedly unlawful conduct and the injury." *W. Penn. Power Co.*, 147 F.3d at 265. Despite drawing all reasonable inferences in Plaintiff's favor, the Court finds Plaintiff has failed to establish this causal connection.

Because the Court finds Plaintiff has failed to establish the requisite elements of a federal antitrust claim, the Court, accordingly grants Defendants' Motion for Summary Judgment, as to Count One.

### 2.    Count Two: Violations of the New Jersey Antitrust Act

New Jersey state courts look to federal case law when interpreting the New Jersey Antitrust Act. *Patel v. Soriano*, 848 A.2d 803, 826 (N.J. Super. Ct. App. Div. 2004) ("We look to federal jurisprudence to guide our interpretation of the [New Jersey Antitrust] Act."). Indeed, the New Jersey Antitrust Act states that it "shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it." N.J. Stat. Ann. § 56:9-18.

Having found that Defendants are entitled to summary judgment as to the federal antitrust claims of Count One, the Court similarly concludes Defendants are entitled to summary judgment

as to Count Two. Defendants' Motion for Summary Judgment, as to Court Two, is therefore granted.

### 3. Count Three: Tortious Interference

To prevail on a claim for tortious interference, a plaintiff must show: (1) "that it had a reasonable expectation of economic advantage, (2) which was lost as a direct result of [the defendant's] malicious interference, and (3) that it suffered losses thereby." *Avaya Inc., RP*, 838 F.3d at 382 (citing *Ideal Dairy Farms, Inc.*, 659 A.2d at 932). Causation is also required for the tortious interference claim. *See Kern*, 2018 WL 4502187, at *10.

As noted above, Plaintiff's arguments in support of its tortious interference claim are wholly unsupported by the record, even with the Court drawing all reasonable inferences in Plaintiff's favor. There is no evidence that the Consent Resolutions or the October 27, 2016 Letter had any influence on the expiration of the NJGROW Tax Credits. Rather, McCourt admitted that the tax credits were conditional and that he failed to provide the NJEDA with the requisite documentation to secure them. McCourt also admitted that he failed to secure a single signed service agreement between the Central CML and a Dunkin' Donuts franchisee.

"[I]f the nonmoving party fails 'to make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be no genuine [dispute] of material fact . . . .'" *Read*, 397 F. Supp. 3d at 625. Because the Court finds Plaintiff has failed to establish the requisite elements of a tortious interference claim, the Court grants Defendants' Motion for Summary Judgment, as to Court Three.

      **4.**    **Count Four: Civil Conspiracy**

Civil conspiracy "is not an independent cause of action, but rather a liability expanding mechanism which exists only if [plaintiffs] can prove the underlying independent wrong." *Tadros*, 2011 WL 1321980, at *9.

Here, the Court has found that Plaintiff has failed to prove Defendants violated federal or state antitrust laws and also failed to prove its claim of tortious interference. The Court, accordingly, finds that Plaintiff has failed to establish the elements of civil conspiracy. The Court, therefore, grants Defendants' Motion for Summary Judgment as to Count Four. *See, e.g.*, *Hunter v. Sterling Bank, Inc.*, No. 09-172, 2011 WL 5921388, at *9 (D.N.J. Nov. 28, 2011) (finding that plaintiffs' civil conspiracy claim must be dismissed because plaintiffs could not sustain their claim for common law fraud, the sole basis of their conspiracy claim).

## V.   **CONCLUSION**

For the reasons set forth above, Plaintiff's Amended Motion for Summary Judgment is denied and Defendants' Motion for Summary Judgment is granted. Plaintiff's Complaint is dismissed with prejudice. The Court will enter an Order consistent with this Memorandum Opinion.

                                      s/ Michael A. Shipp_____

                                      **MICHAEL A. SHIPP**

                                      **UNITED STATES DISTRICT JUDGE**

Dated: May 31, 2020